FILED IN CHAMBERS
U.S.D.C. ROME

Date: Feb 17 2021

JAMES N. HATTEN, Clerk

By: s/Kari Butler

Deputy Clerk

(USAO GAN 6/10) Search Warrant

# United States District Court

NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

Samsung Galaxy S10t cell phone, serial number
R38M301YRPL, IMEI 35541010100750837

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**

Case number: 4:21-MC-03

I, Timothy P. Coakley, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation and have reason to believe that in the property described as:

Samsung Galaxy S10t cell phone, serial number R38M301YRPL, IMEI 35541010100750837 as defined in Attachment A

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

Information described in Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 841 and 846 and Title 18, United States Code, Section(s) 1956 and 1957. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to before me by telephone pursuant to
Federal Rule of Criminal Procedure 4.1

_tpc_
Signature of Affiant

Timothy P. Coakley

February 17, 2021
Date

~~Atlanta, Georgia~~ Rome, Georgia
City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_Walter E. Johnson_
Signature of Judicial Officer

AUSA Alana R. Black

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Timothy P. Coakley, depose and say under penalty of perjury as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May 1997.  I am assigned to the Atlanta Division, Dalton Resident Agency, located in Dalton, Georgia.  As a federal agent, I am authorized to investigate criminal and civil violations of the laws of the United States and to execute search warrants issued under the authority of the United States.  While employed by the FBI, I have been the case agent and/or participated in investigations involving violations of federal law in the areas of drug trafficking, firearms violations, kidnapping, crimes against children, public corruption and complex fraud investigations.  I have gained experience through training opportunities and the everyday work that is involved in conducting these types

of investigations.  Based upon my training and experience, interviews I have conducted with defendants, and other witnesses to, or participants in, drug trafficking activity, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers, import and distribute drugs, their use of cellular telephones and their use of numeric codes and code words to conduct and conceal their transactions. The facts and information in this affidavit are based in part on information provided to me by other law enforcement officers, as well as my personal experience with the case and my background as a Special Agent.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is a Samsung Galaxy S10t cell phone, serial number R38M301YRPL, IMEI 35541010100750837, hereinafter the "Device."  The Device is currently located in the Evidence Control Room of the FBI in Atlanta, Georgia.

2

5.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

*Beginning of Investigation*

6.     In August of 2019, the Calhoun Police Department (CPD), the Drug Enforcement Administration (DEA) and the Federal Bureau of Investigation (FBI) began a joint investigation involving the Ghetto Family 13 gang and their drug trafficking activities in Northwest Georgia. The investigation focused on Elizabeth LOPEZ, who was responsible for the delivery of multi-kilogram quantities of methamphetamine, as well as the collection of proceeds related to those illegal drug sales.  Elizabeth LOPEZ was obtaining the methamphetamine through Luis Perez, aka "Pepo," and was also receiving instructions from Perez as to when and where to pick up the proceeds from the drug sales.

7.     Shortly after initiating the investigation, a confidential source (CS-1) was developed who had previously made purchases of methamphetamine from LOPEZ.[1]  Beginning in August 2019, CS-1 began making controlled purchases of

_____

[1] CS-1 is under investigation by the Calhoun Police Department for distribution of controlled substances.  CS-1 is cooperating with law enforcement officers in

methamphetamine from LOPEZ at LOPEZ'S home, an apartment located at 106

Creekside Drive, Apartment 2, Calhoun, Georgia (LOPEZ RESIDENCE).  All but

two of these purchases occurred inside the LOPEZ RESIDENCE.  Those

controlled purchases of methamphetamine were directed by law enforcement

and ranged in amounts from one ounce to 20 ounces of methamphetamine.

8.     The most recent controlled purchase of methamphetamine from

LOPEZ occurred on or about July 8, 2020, immediately outside of the LOPEZ

RESIDENCE.  Prior to CS-1's arrival, CS-1 arranged to purchase the

methamphetamine through LOPEZ.  Upon arriving in the parking lot, CS-1

walked up to the door of the LOPEZ RESIDENCE and knocked on the door.

Then LOPEZ and a man, subsequently identified as Mark Rosas, answered the

door.  Rosas stepped outside of the LOPEZ RESIDENCE and handed CS-1 two

ounces of suspected methamphetamine.  CS-1 paid Rosas $1,300 and then left the

LOPEZ RESIDENCE.  CS-1 met with law enforcement immediately thereafter

---

the hope of receiving a favorable result in CS-1's criminal investigation (thus far,
CS-1 has not been arrested or charged criminally for the methamphetamine
found in her residence.)  Thus far, information provided by CS-1 has been
reliable.  For example, agents have compared information provided by CS-1 to
information collected on recordings and pole cameras and that information has
been consistent.  CS-1 has a criminal history including convictions for:  criminal
damage to property – 1st degree (felony); forgery – 1st degree (felony); probation
violation (felony); and theft by shoplifting (misdemeanor).

and turned over the suspected methamphetamine.  Agents observed the substance and, in their training and experience, the substances appearance was consistent with that of methamphetamine.  The suspected methamphetamine was sent to the DEA lab for testing.

*July 16, 2020 Traffic Stop*

9.      On July 16, 2020, the Georgia State Patrol initiated a vehicle stop of LOPEZ and her boyfriend Mark Rosas.  The vehicle stop occurred in Dalton, Georgia.  Rosas was driving LOPEZ's 2005 black Cadillac with Georgia tag RQX7821.  During the vehicle stop, Trooper Day located approximately $5,000.00 and two handguns.  The two handguns were in LOPEZ's purse.  LOPEZ claimed that she and Rosas were returning from Chattanooga, Tennessee and the $5,000.00 was the proceeds from a vehicle that she and Rosas sold in Chattanooga, Tennessee.  Rosas had outstanding arrest warrants from Bartow County, Georgia, and was arrested.  LOPEZ drove away in the Cadillac following the arrest of Rosa.

10.      Following the arrest of Rosas, on July 16, 2020, he was booked into the Whitfield County Jail in Dalton, Georgia.  On July 17, 2020, Rosas was released on his own recognizance from the Whitfield County Jail and then transported to the Bartow County Jail in Cartersville, Georgia.  Once Rosas was

received at the Bartow County Jail, he began communicating with LOPEZ via the jail pay telephone system, which is recorded.

*July 23, 2020 Traffic Stop*

11.     On July 23, 2020, during a call made by Rosas from the Bartow County Jail to LOPEZ, LOPEZ told Rosas that she had asked her contact in Atlanta if he had anything.  Based on the investigation to date, I believe LOPEZ meant that she had asked a source of supply in Atlanta if that source of supply had any methamphetamine currently.  Rosas responded to LOPEZ and warned her not do anything until she had the brake light repaired on her Cadillac.

12.     On July 23, 2020, law enforcement began surveillance of LOPEZ at her home, the LOPEZ RESIDENCE.  At approximately 5:30 P.M., LOPEZ and her three children departed in the black Cadillac, Georgia tag RQX7821. At approximately 7:44 P.M., LOPEZ arrived at a parking lot located at 5014 Singleton Road, Norcross, Georgia.  LOPEZ parked away from the storefronts at this location.  Lopez and her children remained in her vehicle.  At approximately 7:59 P.M., a yellow Mini Cooper with a temporary tag pulled alongside of LOPEZ's black Cadillac.  An unidentified Hispanic male exited the Mini Cooper holding a white bag and immediately entered the front passenger seat of LOPEZ's Cadillac.  The Hispanic male exited LOPEZ's vehicle approximately one minute later and without the white bag.  He then drove away in the yellow

Mini Cooper.  Moments later, LOPEZ also left the parking area.  Following this meeting, surveillance was maintained on LOPEZ and her vehicle.  LOPEZ eventually began traveling back toward Calhoun, Georgia.

13.     Based upon these observations, agents requested the assistance from the Georgia State Patrol.  At approximately 10:27 P.M., in Gordon County, Georgia, Trooper Jarrod Daniel observed the faulty brake light and initiated a vehicle stop of LOPEZ.  LOPEZ stopped on Interstate 75 just north of exit 312 in Calhoun, Georgia.  Trooper Daniel asked LOPEZ for consent to search her vehicle; LOPEZ refused.  Calhoun Police Department K-9 Officer Thomas Gray utilized his K-9 narcotics dog "Sido" to conduct a free air sniff of LOPEZ's vehicle.  K-9 Sido provided a positive alert for the presence of narcotics at the rear of the Cadillac.  During a search of the Cadillac, law enforcement found a small handgun underneath the driver seat and a pink duffel-type bag inside the trunk area.  Inside of the pink bag was a smaller "Checkers" restaurant bag that contained approximately 500 grams of methamphetamine. LOPEZ was also in possession of two cellphones at the time of the vehicle stop.  LOPEZ's cellphone is listed as the Device in paragraph 1.  The other cell phone belonged to ROSAS. LOPEZ was placed under arrest for the possession of the methamphetamine.

*LOPEZ's Post-Arrest Statements*

14.     LOPEZ was transferred to the Calhoun Police Department precinct and signed an FBI Advice of Rights form agreeing to speak with the interviewing agents.  During the interview, LOPEZ admitted to obtaining the methamphetamine in Atlanta hours prior to the vehicle stop.  LOPEZ said that she paid $5,000.00 for the methamphetamine.  LOPEZ said that she had one or two more guns and a small amount of marijuana were at her home.

15.     Based on my knowledge and experience, I know that examining data stored on cellular phones can uncover electronically stored information that might serve as evidence of crimes, identify and reveal evidence against criminal associates, and reveal who possessed or used the device. I know that persons who possess cellular phones often use the devices to store digital media depicting themselves, relatives, associates and other items of personal interest. I know that criminal offenders may possess media on such devices depicting criminal associates, contraband, and fruits of crimes.  Cellular phones are also likely to contain contact information pertaining to other persons with whom suspects communicate, to include criminal associates and may contain records of internet and telephone activity to include communications with other criminals via telephone, electronic mail, text messaging, electronic mail and social networking websites.  Such communications among conspirators may pertain to

8

the planning and execution of crimes and their attempts to conceal evidence after a crime has been committed.  Cellular phones may also contain data documenting the location of the user's device during times significant to an investigation and do contain additional records beyond that which can be obtained by law enforcement, via legal process, from a wireless service provider.

*Search Warrant Executed on August 5, 2020*

16.     On or about August 4, 2020, United States Magistrate Judge Walter E. Johnson authorized a search of several electronic devices seized in the ongoing investigation, including the Device.

17.     On or about August 5, 2020, the FBI attempted to unlock and download the Device.  That attempt was unsuccessful, as the technology in use by the Atlanta Field Office at that time did not unlock the Device for a successful download.

18.     On or about August 24, 2020, the search warrant for electronic devices was returned to the Court explaining that two of the downloads were successful and that the three remaining devices were not successfully downloaded.  One of those unsuccessful downloads was the Device.

*New Technology Identified on February 3, 2021*

19.     On or about February 3, 2021, your affiant determined that the FBI now possessed new, more advanced tools to unlock and download Samsung Galaxy S10 cell phones similar to the Device.

20.     The Device is currently in the lawful possession of the FBI.  It came into the FBI's possession after being seized by law enforcement officers on July 23, 2020, incident to LOPEZ's arrest.  Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

21.     The Device is currently in storage in the Evidence Control Room of the FBI in Atlanta, Georgia.   In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

22.     Based on my training and experience, I use the following technical terms to convey the following meanings:

10

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital

11

cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255,

separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.   Based upon my training and experience, I know that most cellular telephones, including Device a, have capabilities that allow them collectively to serve as wireless telephones, digital cameras, portable media players, and GPS navigation devices, and allow internet accessibility. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

25.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous

15

to the search for "indicia of occupancy" while executing a search

warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device

works may, after examining this forensic evidence in its proper

context, be able to draw conclusions about how electronic devices

were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information

on a storage medium that is necessary to draw an accurate

conclusion is a dynamic process.  Electronic evidence is not always

data that can be merely reviewed by a review team and passed

along to investigators.  Whether data stored on a computer is

evidence may depend on other information stored on the computer

and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other

evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose

of its use, who used it, and when, sometimes it is necessary to

establish that a particular thing is not present on a storage medium.

16

26.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

28.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

**ATTACHMENT A**

The property to be searched is a Samsung Galaxy S10t cell phone, serial number R38M301YRPL, IMEI 35541010100750837, hereinafter the "Device." The Device is currently located in the Evidence Control Room of the FBI in Atlanta, Georgia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21 United States Code, Section 841 and 846 and Title 18 United States Code, Section 1956 and 1957 and involve Elizabeth LOPEZ since August 15, 2019, including:

      a.  lists of customers and related identifying information;

      b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.  any information recording LOPEZ's schedule or travel from August 15, 2019 to July 23, 2020;

      e.  all bank records, checks, credit card bills, account information, and other financial records;

      f.  Any and all communications, telephone numbers and notes, appointment books and/or calendars and notes, to-do lists, photos, videos, audio recording, bookmarks, electronic mail, contact lists, and address lists, or any other data concealed within the electronic

device to be searched that may relate to the violations of federal laws listed above;

g.  Any and all records recording the planning, commission, or concealment of the suspected violations of federal laws listed above, including but not limited to records with respect to:

   i.  Drug sales and distribution; and

   ii.  Movement and laundering of drug proceeds

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in

2

order to locate evidence, fruits, and instrumentalities described in this warrant.

The review of this electronic data may be conducted by any government

personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support

staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a

complete copy of the seized or copied electronic data to the custody and control

of attorneys for the government and their support staff for their independent

review.